THE DEPARTMENT OF TRANSPORTATION, Plaintiff-Appellant and Cross-Appellee, v. DRURY DISPLAYS, INC., Defendant-Appellee and Cross-Appellant (National Advertising Company, Defendant-Appellee).

Fifth District    No. 5—99—0567

Opinion filed February 7, 2002.—Rehearing denied March 12, 2002.

Robert E. Becker and Kevin T. Hoerner, both of Becker, Paulson & Hoerner, P.C., of Belleville, for appellant.

Thomas B. Weaver and Cynthia A. Sciuto, both of Armstrong Teasdale, L.L.P., of St. Louis, Missouri, for appellee Drury Displays, Inc.

Caroline L. Hermeling and Kathryn M. Koch, both of Husch & Eppenberger, L.L.C., of St. Louis, Missouri, for appellee National Advertising Company.

Harry J. Sterling, of Harry J. Sterling, P.C., of Fairview Heights, for *amicus curiae*.

JUSTICE WELCH delivered the opinion of the court:

This case involves the extent of a taking in condemnation and the nature of compensation. The ultimate issue on appeal is whether the plaintiff, the Illinois Department of Transportation (the Department), an agency of the State, took the defendants' outdoor advertising signs in addition to the defendants' leasehold interests, to be used in a road construction project. The Department argues that it only condemned the defendants' leasehold interests. The defendants argue that their signs were also taken. A St. Clair County jury awarded defendant Drury Displays, Inc. (Drury), damages of $80,730 and defendant National Advertising Company (National) damages of $146,640. On March 17, 1999, the circuit court entered judgments on the verdicts. The Department appeals from the judgments, and Drury cross-appeals. For the following reasons, we affirm the judgments and deny the cross-appeal.

## BACKGROUND

On July 13, 1994, CSX Transportation, Inc. (CSX), a railroad and the landowner, in exchange for $49,180, executed a quitclaim deed conveying approximately 4.2 of its 60 acres to the Department for highway construction. The Department acquired the property as a part of a project to construct two new right-hand exit lanes off westbound Interstate 55/70/64 onto the Illinois end of the Martin Luther King Bridge. On the subject property, Drury had leased space for a single billboard, and National had leased space for two billboards.[1] On August 31, 1994, the Department filed its complaint seeking to

---

[1]The parties have referred to their agreements as leases. We note that

condemn Drury's and National's leasehold interests in the property. CSX was named but later was dismissed as a party.

The April 17, 1991, lease between CSX[2] and Drury allowed Drury to erect and maintain a sign on the property. The November 15, 1990, and November 15, 1993, leases between CSX and National permitted National to erect and maintain signs on the property. All the leases were terminable by either party upon 60 days' written notice.

According to the Drury lease, Drury was to pay CSX $19,000 per year or 25% of its gross advertising revenue, whichever was greater. The lease provided that any billboard erected on the property by Drury would remain Drury's property upon the termination of the lease. The lease also provided that if Drury failed or refused to remove its billboard within 30 days after the termination of the agreement, then the billboard would become CSX's or CSX could remove the billboard and bill Drury for the costs of the removal. Neither party could assign the lease without the written approval of the other.

According to the November 15, 1993, National lease, National was to pay CSX $8,400 per year or 25% of its gross advertising revenue, whichever was greater. The remaining terms were virtually identical to the Drury lease.

According to the November 15, 1990, National lease, National was to pay CSX $8,000 per year or 25% of its gross advertising revenue, whichever was greater. The remaining terms were similar to the Drury lease, except that CSX could assign its interest without National's consent. However, National could not assign its interest without CSX's consent.

We pause to note that the Department did not exercise any rights it might have possessed, as a successor in interest to CSX, against Drury or National. Instead, in the circuit court it filed a condemnation complaint to terminate the defendants' interests. Given this turn of

---

they are titled as licenses. A lease is a definite agreement of the extent and the bounds of the property demised and transfers exclusive possession to the lessee. A license entitles a party to use the premises for a specific purpose subject to the management and control of the owner. The terms are not synonymous either in their common usage or as legal terms of art. The determination of whether a contractual agreement is a lease or a license is made by analyzing the legal effect of its provisions. See *North Avenue Properties, L.L.C. v. Zoning Board of Appeals*, 312 Ill. App. 3d 182, 189, 191 (2000). Because of the parties' treatment, such an analysis is unnecessary. We will refer to the agreements as leases.

[2]Peterson Enterprises of Orlando, Inc., an agent for CSX, was the named party under the leases. To simplify the matter, we refer to the lessor as CSX throughout this opinion.

events, we point out that the rights between condemnor and condemnee are different from the rights between landlord and tenant.

At the trial, evidence placed all three billboards quite close to the interstate roadway, making them highly visible prior to the construction of the new ramp. Traffic counts were very high and may have exceeded 120,000 cars per day. These outdoor advertising structures could not be disassembled and removed without damaging the integrity of the structures, and such structures could not be economically relocated.

Although there were 60-day-termination provisions in the leases, railroads rarely exercised such provisions, according to the testimony. Exercising such provisions would stop the income stream from the tenant billboard company on the land that the railroad had rented because it was not being used. The short-term nature of the termination provision, common in the outdoor-advertising industry, permitted railroads to lease without board-of-director approval.

The provision in each lease permitting the billboard to remain the property of the billboard company and permitting its removal by the billboard company upon the termination of the lease was present so that the railroad-lessor would not terminate the lease, acquire the billboard, and thereby become a competitor in the outdoor-advertising industry.

Neither Drury nor National possessed deeds for the real property, acquired title insurance, or paid real property taxes for the billboards. On the other hand, these billboards were made of steel, were attached to the real property in approximately 20 feet of concrete, and would last "forever" if regularly maintained. Billboards, in general, are custom-built in conformance with building and safety codes and in consideration of site location and wind-load.

The following text summarizes the testimony given by the expert witnesses at the trial. We omit, here, any discussion of the experts' qualifications, because the subject is not at issue. We do, however, summarily address the qualifications of the Department's expert witness who was precluded from testifying by the circuit court, but we do so in the unpublished portion of this opinion.

Dwain Stoops, a real estate appraiser and valuation consultant, testified on behalf of the Department. Stoops testified that he appraised the three leasehold interests at issue in this case but that he did not value the advertising businesses being conducted on the leased premises. In his opinion, billboards are personal property and are best characterized as trade fixtures, not leasehold improvements. Thus, he concluded that the billboards contributed no value to the underlying land and were worth nothing as real estate in a condemnation action or in terms of the leasehold value.

In valuing the defendants' leasehold interests, Stoops examined the three leases, among other things, to determine if the leasehold interests had any "bonus value." Bonus value is merely the difference, if any, between the market rent and the actual rent. For example, if a tenant's actual rent was lower than the market rent for the space being rented, then the tenant would have bonus value in his interest and would be entitled to the monetary difference. In a similar vein, bonus value could also extend to a landlord who was receiving actual rent from a tenant that was higher than the market rent.

. Stoops considered the three traditional methods of valuation—cost, income, and comparable sales—but was unable to fully apply them in this situation. It appears that in his valuation Stoops considered the leasehold interests but not the improvements. He concluded that there was no bonus value.

Stoops acknowledged, though, that the defendants had a right to sell their leasehold interests as improved, that such sales occurred in the outdoor-advertising industry, and that such property interests had a market value based on income and income multipliers in the industry. Stoops admitted that he was aware of no situation in which a railroad had refused to approve the assignment of a billboard property lease from one owner to another and that it was very rare for a railroad to exercise the 60-day-termination provision.

Linda Truitt testified on behalf of Drury. Truitt characterized and appraised Drury's interest as a leasehold improved with outdoor advertising by using the three traditional methods of valuation—cost, income, and comparable sales. Truitt testified that the fair market value of a leasehold interest improved with an outdoor advertising structure is tied to its income-producing potential within the industry.

■ The cost method of valuation measures the cost to replace property interests, less depreciation. Using this method, Truitt valued Drury's interests at $74,225. However, Truitt testified that this method was the least appropriate method of valuation because it did not take into account the value added by the location.

The income method of valuation is based on the property's income-producing potential. This method, in summary, divides the property's net income by a capitalization rate (a return on and of capital) as determined by market data. The quotient is used as an income valuation. Using this method, Truitt valued Drury's interests at $135,000.

The comparable-sales method of valuation requires a review of prices actually paid in the marketplace for similar properties, an extraction of the gross-income multiplier reflected in those sales, and an application of an appropriate gross-income multiplier to the prop-

erty being appraised. The gross-income multiplier of a similar property is calculated merely by dividing the sale price by the annual gross income produced by the advertising structure. Using this method, Truitt valued Drury's interests at $142,000.

Truitt characterized Drury's interests in this case as real property, and using these three valuation methods, she concluded that the fair market value of Drury's leasehold interest as improved by an outdoor advertising structure was $140,000.

R.J. Ruppert testified on behalf of National. He characterized National's billboard property as a real estate capital improvement, with its value being separate from the business value of its owner. Ruppert valued National's interests at $210,000 under the cost method, at $208,000 under the income method, and at $211,000 to $214,000 under the comparable-sales method. Using these three valuation methods and placing the most weight on how the marketplace values billboard property interests, Ruppert concluded that the fair market value of National's interests was $210,000.

We turn now to the applicable standards of review and to the issues presented on appeal.

## DISCUSSION

The Department presents three separate issues on appeal. The first issue is whether the circuit court erred in denying the Department's motion for judgment in the amount of $0 notwithstanding the verdict. The second issue is whether the circuit court erred under several enumerated grounds, entitling the Department to a new trial. The third issue is whether the circuit court erred in denying the Department's motion for a new trial where the verdicts were against the manifest weight of the evidence.

■ The Department first argues that the circuit court erred in denying the Department's motion for judgment notwithstanding the verdict. We disagree. A judgment notwithstanding the verdict is appropriate only in those cases where all of the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 511 (1967). We review *de novo* the trial court's decision to deny a motion for judgment notwithstanding the verdict, applying the same standard used by the circuit court. *Hernandez v. Schittek*, 305 Ill. App. 3d 925, 930 (1999).

The Department contends that the defendants' only compensable property interest under the condemnation statute (735 ILCS 5/7—101 (West 2000)) is the leasehold interest. Moreover, it claims that it did

not even condemn the billboards, because they are personal property.[3]
The Department reasons that, because the experts agree the leases
had no bonus value, no compensation is due. National and Drury
contend that the evidence showed that outdoor advertising structures
are bought and sold in the industry marketplace for more than simply
the bonus value of the lease. We believe that the Department's inter-
pretation overlooks the plain language of the statute.

■ Our resolution of this matter is based upon language added by
a 1993 amendment to the compensation section of the Eminent
Domain Act (Pub. Act 87—1205, effective July 1, 1993 (1992 Ill. Laws
3569) (amending 735 ILCS 5/7—101 (West 1992)). It appears that this
language has not yet been construed by an Illinois court, making this
a case of first impression. After the amendment, the statute read as
follows, with the new language italicized:

> "§ 7—101. Compensation—Jury. Private property shall not be
> taken or damaged for public use without just compensation, and in
> all cases in which compensation is not made by the state in its
> corporate capacity, or a political subdivision of the state, or
> municipality in its respective corporate capacity, such compensa-
> tion shall be ascertained by a jury, as hereinafter prescribed. Where
> compensation is so made by the state, a political subdivision of the
> state, or municipality, any party upon application may have a trial
> by jury to ascertain the just compensation to be paid. Such [a]
> demand on the part of the state, a political subdivision of the state,
> or municipality[ ] shall be filed with the complaint for condemna-
> tion of the state, a political subdivision of the state, or municipality.
> Where the state, a political subdivision of the state, or municipality
> is plaintiff, a defendant desirous of a trial by jury must file a
> demand therefor on or before the return date of the summons
> served on him or her or fixed in the publication in case of
> defendants served by publication. In the event no party in the
> condemnation action demands a trial by jury as provided for by
> this section, then the trial shall be before the court without a jury.
> *The right to just compensation as provided in this Article applies to
> the owner or owners of any lawfully erected off-premises outdoor
> advertising sign that is compelled to be altered or removed under
> this Article or any other statute[ ] or under any ordinance or regula-*

---

[3]We note that the power of eminent domain extends to every kind of prop-
erty. *City of Edwardsville v. County of Madison*, 251 Ill. 265, 266 (1911).
However, the proceeding is not to condemn personal property, and the build-
ings and improvements could only be affected when they become legally a part
of the soil to which they are attached so as to pass with the title as realty. See
*Schreiber v. Chicago & Evanston R.R. Co.*, 115 Ill. 340, 346 (1885).

*tion of any municipality or other unit of local government[ ] and also applies to the owner or owners of the property on which that sign is erected.*" (Emphasis added.) 735 ILCS 5/7—101 (West Supp. 1993).

■ The plain meaning of the language used by the legislature is the best indication of legislative intent. *Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A.*, 186 Ill. 2d 472, 486 (1999). When the language is clear, the court should not look to extrinsic aids for construction. *Bogseth v. Emanuel*, 166 Ill. 2d 507, 513 (1995). When a statute is amended, it is presumed that the legislature intended to change the law as it formerly existed. *Scribner v. Sachs*, 18 Ill. 2d 400, 411 (1960).

■ Looking at the plain language of the statute, we think the first part of the pertinent sentence might be rephrased colloquially as: Billboard owners have a right to just compensation for any condemned sign. We believe that meaning is unmistakably clear. We reject the Department's interpretation that "just compensation" means only bonus value. Just compensation is the fair market value of the property at its highest and best use on the date the complaint is filed. *County of St. Clair v. Wilson*, 284 Ill. App. 3d 79, 82 (1996). Fair market value is the amount of money a willing buyer under ordinary circumstances would pay to a willing owner in a voluntary sale when neither party is under any obligation to buy or sell. See 735 ILCS 5/7—121 (West 2000); *Wilson*, 284 Ill. App. 3d at 82. Had the legislature intended just compensation to mean only bonus value, it could have used the words "bonus value" in the statute.

The Department also contends, without the benefit of citation to legislative history or to the record, that the statutory language applies only to local authorities wielding their police powers to regulate billboards out of existence. We believe that the Department's interpretation overlooks the disjunctive clauses of the statute. "The right to just compensation as provided in this Article applies to the owner *** of any lawfully erected off-premises outdoor advertising sign that is compelled to be *** removed under this Article *or* any other statute[ ] *or* under any ordinance or regulation of any municipality or other unit of local government ***." (Emphasis added.) 735 ILCS 5/7—101 (West Supp. 1993). Under the Department's interpretation of the statute, the right to compensation for billboard owners "in this Article" is read out of existence. Under our reading of the statute, the owners of billboards that are condemned "under this Article"—the condemnation statute—are entitled to just compensation. It appears to us that if the legislature only wanted to compensate billboard owners who had their signs zoned out of existence under the police power of a

municipality, as the Department contends, then our legislature erred in placing this new language in the *condemnation statute* and by using the language "in this Article" and "under this Article." In this same vein, if the legislature intended to compensate billboard owners who are forced to remove their signs under regulatory authority, then it likely intended to compensate billboard owners who had their signs condemned.

Consequently, given the 1993 statutory amendment, when viewing the evidence in the light most favorable to National and Drury, we conclude that the evidence does not so overwhelmingly favor the Department that no contrary verdict could ever stand. We conclude that the circuit court did not err in denying the Department's motion for judgment notwithstanding the verdict.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

GOLDENHERSH and KUEHN, JJ., concur.