# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Board of Education of Meridian Community Unit School District No. 223 v. Illinois Property Tax Appeal Board, 2011 IL App (2d) 100068**

---

| | |
|---|---|
| Appellate Court Caption | THE BOARD OF EDUCATION OF MERIDIAN COMMUNITY UNIT SCHOOL DISTRICT NO. 223 and THE OGLE COUNTY BOARD OF REVIEW, Petitioners, v. THE ILLINOIS PROPERTY TAX APPEAL BOARD and ONYX ORCHARD HILLS LANDFILL, INC., Respondents. |
| District & No. | Second District<br>Docket No. 2-10-0068 |
| Filed | June 28, 2011 |
| Modified upon denial of rehearing | October 24, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute over the Property Tax Appeal Board's decision reducing the tax assessment for a parcel of land owned by respondent and used as a sanitary landfill, the appellate court affirmed the Board's decision that the fair market value of the property was $10 million, based on the conclusion that the cost approach used by respondent's first appraiser in finding a valuation of $10,660,000 supported the income approach used by its second appraiser in reaching a valuation of $9,600,000, notwithstanding the fact that each appraiser used a single approach, since the comparable-sales approach would not have been reliable where the sales were part of a Department of Justice divestiture order that included the property at issue, and under the circumstances, the methodology employed by the appraisers was appropriate. |

| | |
|---|---|
| Decision Under Review | Petition for review of order of the Illinois Property Tax Appeal Board, No. 03-00470.001-I-3. |
| Judgment | Affirmed. |
| Counsel on Appeal | John B. Roe, State's Attorney, of Oregon, and Stuart L. Whitt, Joshua S. Whitt, and Catherine M. Hess, all of Whitt Law LLC, of Aurora, for petitioners. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and John P. Schmidt, Assistant Attorney General, of counsel), for respondent Illinois Property Tax Appeal Board. |
| | Robert M. Sarnoff, Michael F. Baccash, and Jeffrey G. Hertz, all of Sarnoff & Baccash, of Chicago, for respondent Onyx Orchard Hills Landfill, Inc. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices Schostok and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1    Petitioners, the Board of Education of Meridian Community Unit School District No. 223 (school district) and the Ogle County Board of Review (BOR), appeal from the decision of respondent the Illinois Property Tax Appeal Board (PTAB) reducing the 2003 tax assessment for a parcel of land owned by respondent Onyx Orchard Landfill, Inc. (Onyx). We affirm.

¶ 2    The property at issue (instant landfill) is a sanitary landfill consisting of 333.78 acres located in Davis Junction, Illinois. The landfill is three rectangular parcels, identified by separate parcel identification numbers; however, only one parcel, consisting of 159.54 acres, is involved in this proceeding. As of January 1, 2003, the date of valuation, the Ogle County assessment on the parcel at issue was $2,501,240. The BOR increased the assessment to $8,633,000, and Onyx appealed to the PTAB, which, after an extensive evidentiary hearing, reduced the assessment to $3,321,000.

¶ 3    The record shows that the instant landfill was among a number of assets located throughout the United States that were subject to a federal divestiture order, the purpose of which was to establish viable competition in the waste disposal business. On March 31,

2000, the instant landfill was transferred from BFI Waste Systems of North America, Inc., to Onyx's parent company. Onyx owns and operates the instant landfill.

¶ 4 At the hearing before the PTAB, Onyx presented the testimony of two appraisers, both of whom opined as to the fair market value of the entire landfill, even though only one parcel was at issue. One appraiser calculated the market value at $10,660,000 and the other at $9,600,000. The school district, which had been allowed to intervene, presented evidence that the entire landfill had an estimated market value of $25,900,000. Below, we set forth only those facts necessary to an understanding of the issues in this appeal.

¶ 5 Onyx's Appraisals

¶ 6 Michael J. Kelly, a real estate appraiser with 32 years' experience appraising commercial and industrial properties, including landfills, testified that the purpose of the Onyx appraisal was to determine the unencumbered fee-simple value of the instant landfill as of January 1, 2003. Kelly testified that, given that his assignment was to value the real estate only and that the landfill was a going concern, the cost approach was the best method to calculate the market value. According to Kelly, the use of the income-capitalization approach to determine reliable market data, even assuming one could obtain valid arm's-length royalty agreements (leases between landfill owners and operators), would entail too many adjustments to the income stream to provide a reliable value for the real estate only. Kelly also rejected the sales-comparison approach because the sale of an operating landfill is of the going concern and thus the approach necessitates significant adjustments, such as excluding elements of business value that contribute to the sale price. Kelly questioned the reliability of any figure reached using the sales-comparison method. As a result, Kelly decided to use only the cost approach.

¶ 7 Using this method, he determined that the value of the instant landfill was $10,660,000. He arrived at this number by first determining the value of the land as though it were vacant. By looking at recent sales of agricultural properties in Ogle County, Kelly concluded that the land's value was $4,000 per acre. He then calculated the replacement cost for the improvements on the property, which totaled $2,618,000. He then determined that the cost of cell liners for the developed portion of the landfill was $19,150,000, to which he applied a depreciation factor because the landfill had reached 63% of its permitted capacity as of January 1, 2003. Factoring in depreciation reduced the value of the cell liners to $7,472,290. Kelly then depreciated the value of improvements other than the cell liners and came to a total of $2,036,500. When he added the value of the land, the improvements, and the cell liners, he came to a total of $10,658,790, which he rounded to $10,660,000.

¶ 8 Douglas Main was Onyx's second appraiser. He specialized in waste and the waste industry, having directed for five years PriceWaterhouseCoopers' Waste Group, a national practice providing advisory consulting services to the waste management industry. Prior to working for PriceWaterhouseCoopers, Main owned his own company called Landfill Valuation of America. Main testified that his assignment in the present case was to value the real estate only and to exclude from his valuation the going-concern or whole-business value, which combines all the assets. Main searched for any sale of the instant landfill within three

years of the valuation date in order to determine its market value, defined by an arm's-length transaction between unrelated parties without force or a specific reason to buy or sell. Onyx's purchase of the landfill did not meet the criteria for an arm's-length transaction, because it occurred under duress when the Department of Justice ordered the divestiture of the instant landfill as part of a portfolio of assets. Moreover, according to Main, price allocations for some of the assets in the portfolio sale had no relevance to market value because they were made for accounting purposes and were not reflective of the real estate only.

¶9 Main rejected the cost approach because it was not the best indicator of value, due to the difficulty in estimating the land value of such a large parcel and in defining accrued depreciation and because the landfill was a wasting or depleting asset. Main also rejected the sales-comparison approach because most sales of landfills involve going-concern sales data, which include personal property and intangibles, and because many landfill sales are part of a portfolio acquisition. According to Main, because of the numerous adjustments required, the sales-comparison approach would not reflect market-participant behavior that focuses on the income-generating capability of the instant landfill. Therefore, Main applied the income approach in his appraisal.

¶10 In applying the income approach, Main relied on the market/royalty method in order to reflect the value of the real estate only. The market/royalty method essentially translates capitalization of future income attributable to the real estate into an estimate of the net present worth of the real estate. Main first calculated Onyx's tipping fee, which is the fee that Onyx would charge for dropping off waste at a landfill. Main estimated a net tipping fee of $18.50 per ton and then deducted $5 per ton for surcharges and host fees, which are collected and passed on to appropriate agencies. Thus, Main calculated Onyx's tipping fee at $13.50 per ton. He next calculated annual waste intake and multiplied it by the annual tipping fees to arrive at Onyx's annual income from tipping fees. Then Main examined leasing and royalty agreements for other operating landfills, and, after making appropriate adjustments, he determined that Onyx's market rent/royalty rate was 12%. By multiplying the market rent/royalty rate by the amount of annual tipping-fee income, adding miscellaneous income and subtracting miscellaneous administrative expenses, then applying an annual discount rate over the remaining life of the landfill, Main determined that the value of the instant landfill was $9,600,000.

¶11                               The School District's Appraisal

¶12 The school district hired Michael McCann, who had approximately 23 years' experience appraising all types of waste disposal facilities, including sanitary landfills, to appraise the instant landfill. McCann's assignment was to appraise the fair market value of the instant landfill as of January 1, 2003, exclusive of any business or enterprise value. McCann also appraised not the individual parcel at issue, but the entire landfill as one whole economic unit. McCann considered all three approaches to determine the property's value, but he did not utilize the cost approach because, in his opinion, it was irrelevant because landfills are not bought or sold on a cost-approach basis. Rather, McCann utilized the sales-comparison and income approaches. In utilizing the sales-comparison approach, McCann reviewed

numerous sales of landfill properties, including properties in northern Lake County, California, and Michigan. Under the sales-comparison approach, McCann appraised the instant landfill at $25,500,000. Utilizing the income approach, McCann appraised the instant landfill at $25,900,000. This figure was arrived at by multiplying waste intake volume by a tipping fee of $33 per ton with an increase of 2.3% per year for the life of the landfill. McCann selected the tipping fee from data contained in a 2002 report regarding tipping fees charged at 10 northern Illinois landfills.

¶ 13    The school district asked Mark Pomykacz, a real estate and business appraiser with over 20 years' experience to review the submitted appraisals for their reliability and credibility. Pomykacz found the Kelly and Main appraisals to be materially inconsistent, and he did not believe that they could be reconciled to determine a fair market value for the instant landfill. Pomykacz testified that the income that Main calculated in his appraisal was insufficient to support the cost that Kelly ascribed to the instant landfill. According to Pomykacz, if Onyx relied on the income as described in Main's appraisal, it would not construct the improvements described in Kelly's appraisal.

¶ 14                                   Onyx's Rebuttal

¶ 15    In rebuttal, Onyx presented the testimony of Jerry Jones, a real estate appraiser with 34 years' experience, including the appraisal of landfills. Jones reviewed the McCann appraisal. Jones testified that McCann's sales-comparison approach was flawed because all of the sales of landfills that McCann referenced were duress sales, not arm's-length transactions, and thus they did not reflect fair market value. According to Jones, the tipping fee that McCann used in his income approach was a "gate fee," the highest rate charged at a landfill for a one-time user, which did not take into account discounts that may be given. Also, according to Jones, there was no relation between McCann's gate fee and the market rate, because the fee that McCann used was for uncompacted waste.

¶ 16    On August 29, 2007, the hearing concluded, and the PTAB took the case under advisement.

¶ 17                          The School District's Posttrial Motion

¶ 18    On September 8, 2008, while the matter was under advisement, the school district filed a posttrial motion "to consider additional legal authority." In its motion, the school district cited *Cook County Board of Review v. Property Tax Appeal Board* (*Omni*), 384 Ill. App. 3d 472 (2008), and argued that, under *Omni*, Onyx failed to meet its burden of going forward with evidence sufficient to challenge the assessment, because both Kelly and Main omitted the sales-comparison approach in estimating the market value of the instant landfill. Onyx objected to the posttrial motion, on the ground that the school district forfeited the issue by not raising it either in a pretrial motion, during the hearing, or in its final argument. Alternatively, Onyx argued that *Omni* was inapplicable to the present case. The school district replied that, under the rules of practice and procedure applicable to the PTAB, whether Onyx met its burden of going forward with sufficient evidence was not a matter capable of being forfeited.

¶ 19                              The PTAB's Decision

¶ 20    On December 23, 2009, the PTAB filed its final administrative decision. The PTAB found that Onyx met its burden of going forward with evidence sufficient to challenge the assessment. The PTAB ruled that a party cannot forfeit the issue of whether the burden of going forward has been met, and it granted the school district's motion to consider the *Omni* decision.

¶ 21    The PTAB summarized *Omni* as holding that "an appraisal excluding the sales comparison approach [has] to be justified with more than unsupported conclusions that adjustments would be too subjective, and that the sales comparison approach could not be employed because there were no sales of properties similar to the subject." The PTAB then said, "There is no doubt on this record that landfills are sold from time to time, however, the question becomes whether the data reflects comparable sales." The PTAB noted that, while McCann examined the sale of the instant landfill as well as three other sales that were part of the same divestiture order, McCann opined that it was more appropriate to rely on the income approach to value the instant landfill. Thus, the PTAB concluded that McCann used the sales-comparison approach as, at most, a check on his income approach, but that the sales-comparison approach in the McCann appraisal was "not otherwise utilized in arriving at a final opinion of value."

¶ 22    The PTAB stated:

"As outlined by the court in the *Omni* decision, the [PTAB] finds that this record justifies the exclusion of the sales comparison approach in that the appraisers found that reliable data could not be derived from the sale of the subject or from the sales of reasonably comparable property. *** In summary, two appraisal experts concluded that the [sales-comparison] approach was not useful with regard to the subject landfill primarily because of the numerous adjustments necessary to sales data. While McCann did a sales comparison approach, all three sales considered were as a result of the same divestiture order that lead [*sic*] to the sale of the subject."

With regard to the sales-comparison approach, the PTAB further stated:

"[A]s established on the record[ ] there are circumstances where a property is so unique and/or where the sales data that are available involve highly complex transactions of multiple properties, business value and/or intangible assets that it is nearly impossible to decipher the purchase price of a single property with any level of certainty. ***

     The [PTAB] finds on this record that a showing has been made which justifies a single approach appraisal excluding the sales comparison approach can [*sic*] be relied upon as the 'best evidence of market value' in accordance with the opinion [in *Omni*]. Thus, the [PTAB] finds that [Onyx's] submission of appraisals relying upon the cost and income approaches to value, respectively, sufficiently challenged the correctness of the assessment of the subject property."

¶ 23    With respect to the above finding, the PTAB also found that, due to the compulsion created by the Department of Justice order, the sales of landfills did not meet the definition of arm's-length transactions and thus the PTAB could not rely on those sales to ascertain fair

market value. Additionally, the PTAB found that the sales-comparison approach used by McCann lacked reliability because the adjustments he used "were vague at best." "As a result," the PTAB found that "the entire sales comparison analysis performed by McCann is questionable and unreliable." Further, the PTAB found that the data considered by McCann "lacks credibility or reliability and therefore the [PTAB] finds McCann's sales comparison approach does not support the subject property's 2003 assessed value."

¶ 24    The PTAB then found that the income approach utilizing a market rent/royalty analysis "reflects the property's chief source of value," because the net income from receiving waste reflected the instant landfill's chief source of value. "[T]he value of the land appears to lie in its ability to receive waste over the remaining life of the landfill." The PTAB derived this last statement from the undisputed fact that the highest and best use of the subject property was as a landfill.

¶ 25    Next, the PTAB considered which of the two appraisals that used the income approach, McCann's or Main's, was better supported and more credible. The PTAB found that Main's data was more reliable McCann's.

¶ 26    McCann, the PTAB explained, used data published in a regional report that presented regional data. While the regional report included tipping-fee data, there was nothing presented to reflect the accuracy of the information, whether the fees reported were gross or net, or what the amounts truly represented. "Based on the entirety of the evidence and testimony presented, the [PTAB] finds that Main's selection of an appropriate tip fee was better researched, supported and explained on the record than that of McCann."

¶ 27    The PTAB commented that Main and McCann agreed on the starting point in determining annual waste volume, but differed on the instant landfill's remaining economic life. McCann assumed a life of 17 years, while Main assumed a life of 13 years. The PTAB found that Main's data presented the best evidence because it was derived from engineering reports pertaining to the instant landfill, whereas McCann's data came from published conversion rates that had not been changed since the 1990s. "In weighing the data presented by the two appraisers, the [PTAB] finds the data presented by Main to be more credible and reliable."

¶ 28    Next, the PTAB considered which appraisal more accurately reflected the administrative expenses in managing the instant landfill lease. The PTAB noted that McCann's appraisal assumed that 1% of income would reflect the cost for periodic monthly auditing, legal work, management, and miscellaneous expenses, but that McCann chose to apply a higher income rate of 5% without substantiating the use of the higher amount. As Main's selection of a 2% income rate was more credible and conformed to McCann's initial conclusion of 1%, the PTAB adopted Main's calculation.

¶ 29    Both McCann and Main chose applicable discount rates (future income discounted to present-day value). McCann's discount rate was 22.5%; Main's discount rate was 17%. The PTAB concluded, "While the rates are not dramatically different, the [PTAB] finds that Main has better discussed and supported the chosen rate than did McCann in his report and testimony."

¶ 30    In summary, the PTAB found that "Main presented the more competent, professional and

logical testimony in support of his appraisal methodology, data used, and final value conclusion over the presentation of McCann." Because Main's appraisal was "more credible and a better indicator of the subject's fair market value using the income approach," the PTAB gave McCann's final value conclusion "little weight" in its analysis.

¶ 31    Finally, the PTAB concluded that Kelly's cost approach lent support and credence to Main's income-approach valuation of $9,600,000. Taking Kelly's valuation of $10,660,000 and Main's of $9,600,000, the PTAB found the instant landfill to have an estimated fair market value as of January 1, 2003, of $10 million.

¶ 32    The school district and the BOR timely appealed to this court.

¶ 33                                           ANALYSIS

¶ 34    The school district and the BOR raise three arguments: (1) the PTAB erred in finding that Onyx, as a matter of law, met its burden of going forward with evidence sufficient to challenge the assessment; (2) the PTAB erred as a matter of law in finding that the single-approach appraisals excluding the sales-comparison approach were the best evidence of market value; and (3) the PTAB's finding that Kelly's cost approach lent support and credence to Main's income approach valuation was against the manifest weight of the evidence.

¶ 35    The first and second arguments are interrelated and present us with the question of whether the PTAB considered appraisals that utilized the proper methodology for the valuation of the instant landfill. This is a legal question that we review *de novo*. *Omni*, 384 Ill. App. 3d at 479. The findings of an administrative agency are *prima facie* correct in a case such as this, and the court should not intervene in a case where property has been assessed higher or lower than it should have been through a mere error of judgment by the administrative agency. *Chrysler Corp. v. Illinois Property Tax Appeal Board*, 69 Ill. App. 3d 207, 210 (1979). However, where the court is faced with potential use of an improper method of valuation, rather than with a mere difference of opinion as to the market value of a particular parcel, courts have intervened. *Chrysler*, 69 Ill. App. 3d at 210-11.

¶ 36    Illinois law requires that all real property be valued at its fair cash value, estimated at the price it would bring at a fair voluntary sale where the owner is ready, willing, and able to sell but not compelled to do so, and the buyer is likewise ready, willing, and able to buy, but is not forced to do so. *Chrysler*, 69 Ill. App. 3d at 211. "Fair cash value" is synonymous with fair market value, and an arm's-length sales transaction is the best evidence thereof. *Walsh v. Property Tax Appeal Board*, 181 Ill. 2d 228, 230 (1998). There are three basic methods of evaluating real property: (1) the sales comparison approach; (2) the income approach; and (3) the reproduction-cost approach. *Chrysler*, 69 Ill. App. 3d at 211. In the absence of market value established by a contemporaneous arm's-length sale, the sales-comparison approach is the preferred method and should be used when market data is available. *Omni*, 384 Ill. App. 3d at 480-81. The sales-comparison approach relies on sales of comparable properties in the open market to reach a determination of the subject property's fair cash value. *Omni*, 384 Ill. App. 3d at 481. The existence of market data to determine fair cash value is central to the sales-comparison (also called market) approach. *Omni*, 384 Ill. App. 3d at 481. The

income method is based on the property's income-producing potential and divides the property's net income by a capitalization rate, which is a return on and of capital as determined by market data. *Department of Transportation v. Drury Displays, Inc.*, 327 Ill. App. 3d 881, 885 (2002). Generally, the reproduction-cost approach should be emphasized only in the context of special-purpose property, which is defined as property of such a nature and applied to such a special use that it cannot have a market value. *Chrysler*, 69 Ill. App. 3d at 212.

¶ 37 Here, neither of Onyx's appraisers utilized the sales-comparison approach, and the school district and the BOR contend that the single-approach appraisals were, as a matter of law, insufficient to satisfy Onyx's burden of going forward. The school district and the BOR rely on *Omni*, which held:

"When a party appeals an assessment in the PTAB, that party has the burden of going forward with 'substantive, documentary evidence or legal argument sufficient to challenge the correctness of the assessment.' [Citation.] The PTAB must look to the challenging party's submission of substantive, documentary evidence to determine whether that party has carried its burden of challenging the correctness of the assessment. Where the correctness of the assessment turns on market value and there is evidence of a market for the subject property, a taxpayer's submission that excludes the sales comparison approach in assessing market value is insufficient as a matter of law." (Internal quotation marks omitted.) *Omni*, 384 Ill. App. 3d at 484.

¶ 38 We begin by reviewing the PTAB's factual findings in our case, which the school district and the BOR do not challenge. Then we will look in depth at the *Omni* decision, which, in our view, the school district and the BOR misread.

¶ 39 The following are the PTAB's findings of fact that are pertinent to this issue. Landfills are sold from time to time. McCann examined the sale of the instant landfill and three additional sales that were part of the same Department of Justice divestiture order. Those sales reflected complex transactions in most instances, and McCann's expert opinion was to rely on the income approach rather than the sales-comparison approach. Pomykacz noted that sales involving litigation need further investigation, and Jones opined that, because there is a great deal of business-enterprise value and intangible-asset value in landfill operations, it is very difficult, if not impossible, to isolate and value them individually. Kelly and Main agreed that sales of landfills include going-concern value, which requires questionable adjustments.

¶ 40 The compulsion to sell created by the Department of Justice order meant that those sales do not meet the definition of an arm's-length transaction. Given the lack of substantiated data regarding the sales price allocated for the instant landfill, the PTAB could not rely upon that price to ascertain the fair market value of the instant landfill. McCann's sales-comparison calculations lacked reliability because his adjustments were vague, at best. His entire sales-comparison analysis was questionable and unreliable. Although McCann did not ultimately rely upon his sales comparison analysis, the data he considered lacked credibility and reliability, and, therefore, they did not support the instant landfill's 2003 assessed value. Given the foregoing, the PTAB should look to other methods of valuation.

¶ 41    In light of the above findings of fact, which are not challenged by the school district and the BOR, we examine *Omni*. Omni Chicago was the owner of a Chicago parcel improved with a building consisting of three distinct areas: an office space, a hotel space, and a retail space. *Omni*, 384 Ill. App. 3d at 473. The Cook County assessor assessed the property at a market value of $48,296,794 for the year 1998, and Omni appealed to the PTAB both the market value determination and the assessment level. *Omni*, 384 Ill. App. 3d at 473-74. Before the PTAB, Omni presented an appraisal of $43,250,000, which was based on the income approach. *Omni*, 384 Ill. App. 3d at 474. The appraiser considered all three methods of valuation, but he found that neither the sales-comparison approach nor the cost approach was appropriate, because of the unique character of the building and because there had been no sales of similar properties within the Chicago area. *Omni*, 384 Ill. App. 3d at 474. At the conclusion of the appraiser's testimony, the Cook County Board of Review moved for a directed finding, arguing that the limited scope of Omni's appraisal and its reliance on the income approach were insufficient to establish market value. *Omni*, 384 Ill. App. 3d at 476. The motion was denied. *Omni*, 384 Ill. App. 3d at 476. The board then presented its appraisal, which utilized all three traditional approaches and analyzed comparable sales. *Omni*, 384 Ill. App. 3d at 476-77. The PTAB found that the subject property was unique in the Cook County market and applied the income approach in accepting Omni's estimate of market value. *Omni*, 384 Ill. App. 3d at 478.

¶ 42    In reversing the PTAB, the appellate court noted that the record contained a list of 34 sales offered as sales of properties comparable to the three distinct areas and evidence of rental information from nine buildings. *Omni*, 384 Ill. App. 3d at 483-84. Thus, the appellate court concluded that market data of comparable properties existed to sufficiently calculate market value under the sales-comparison approach. *Omni*, 384 Ill. App. 3d at 484. Citing *Chrysler*, the court said that, where there is evidence of comparable sales, the PTAB's valuation based on the exclusion of that evidence is incorrect as a matter of law. *Omni*, 384 Ill. App. 3d at 484. However, the court pointed out that "[i]t was not demonstrated that employing the sales comparison approach would have resulted in *unreliable* estimates of the fair market value of the Omni property." (Emphasis in original.) *Omni*, 384 Ill. App. 3d at 485 n.3. The court further stated: "The exclusion of the sales comparison or market approach in light of the existence of market data regarding comparable properties rendered Omni's appraisal insufficient as a matter of law to challenge the correctness of the property tax assessment." *Omni*, 384 Ill. App. 3d at 487.

¶ 43    The *Omni* court delivered a supplemental opinion on denial of rehearing. The court noted that Omni's rebuttal expert witness testified that an appraisal not employing the sales-comparison approach would present a critical problem, and only Omni's principal appraiser relied exclusively on the income approach. *Omni*, 384 Ill. App. 3d at 488. "The appraiser did so without any showing that either of the other two approaches would provide results that were not 'meaningful.' " *Omni*, 384 Ill. App. 3d at 488.

¶ 44    The school district and the BOR contend that the Main and Kelly appraisals were insufficient as a matter of law under *Omni* because they excluded the sales-comparison approach. The school district and the BOR argue that there was evidence that the instant landfill was saleable, because Onyx purchased it. The school district and the BOR assert that

we should limit our discussion to the Main and Kelly appraisals, rather than look to the entire record, because the insufficiency of Onyx's evidence meant that it did not meet its burden of going forward.

¶ 45    We do not read *Omni* as requiring application of the sales comparison approach where it would result in unreliable estimates of fair market value. The property at issue in *Omni* was used as a hotel, retail space, and office space in an upscale urban area for which comparable sales data was available. The instant property is a sanitary landfill, which has a defined economic life. The record reflects that Onyx purchased the landfill in March 2000 after the seller was ordered to divest some of its assets by the Department of Justice. We agree with the PTAB that such a sale does not meet the criteria for an arm's-length transaction and is not indicative of fair market value. Moreover, according to the Kelly appraisal, Onyx purchased the landfill in one transaction that included a portfolio of northern Illinois landfills, and the consideration allocated for the instant landfill was based on the property tax assessment at the time of the transfer. Consequently, Kelly properly placed no weight on the allocated consideration in determining fair market value.

¶ 46    The appellate court in *Omni* considered the entire record in concluding that Omni had not met its burden of going forward. Therefore, the suggestion that we are limited to reviewing Onyx's evidence in its case-in-chief is without foundation or precedent. However, even if we were to so limit our inquiry, the record supports the exclusion of the sales-comparison approach. As we explained above, the sale of the instant landfill to Onyx is not a reliable indicator of fair market value. Kelly rejected the sales-comparison approach for two reasons: (1) a sale of a landfill is of a going concern, and thus extensive adjustments are necessary to derive a sale price for the real estate only; and (2) sales of landfills might not yield comparable data, because analyzing each sale on a common unit of comparison, such as price per remaining cubic yard of capacity, would be a function of the profitability of the specific landfill; the profitability of a given landfill is affected by local and state landfill regulations, and each locale has different requirements. In Kelly's expert view, "[t]hese substantial adjustments would substantially weaken the reliability of the [s]ales [c]omparison [a]pproach." Main, in the narrative of his appraisal, also explained why he excluded the sales-comparison approach. First, most sales of landfills involve multiple assets and/or business components, not just the real estate. Second, because of the wasting nature of a landfill, unique and property-specific permit restrictions, location, and other factors, adjusting sales data would be problematic and not indicative of market participant behavior. Main did not consider the sales-comparison approach to be a reliable indicator of fair market value. Kelly's and Main's reasons for excluding the sales-comparison approach are in contrast to Omni's assertion, which the PTAB adopted, that the sales-comparison approach was " 'problematical.' " *Omni*, 384 Ill. App. 3d at 485. The appellate court in *Omni* construed " 'problematical' " to mean "difficult to do" and rejected the argument that the sales-comparison approach may be omitted on that basis. *Omni*, 384 Ill. App. 3d at 485. Here, Main and Kelly concluded, not that the sales comparison-approach would be difficult to do, but that it would lead to an unreliable estimate of fair market value.

¶ 47    The school district and the BOR deny the unique character of landfills. However, the record supports the conclusion that they are unique. They are a wasting, or a depleting, asset.

They are subject to numerous regulations that affect their profitability. The school district and the BOR do not dispute that the highest and best use of the instant property is to continue its use as a landfill. Moreover, when we examine the record as a whole, as we may do under *Omni*, we consider the PTAB's factual findings that (1) McCann used the sales-comparison approach as, at most, a check on his income approach, and (2) McCann's sales-comparison analysis was "questionable and unreliable." The school district and the BOR dispute neither factual finding.

¶ 48        The *Omni* court tucked its most significant statement into footnote 3, where it found that Omni failed to demonstrate that employing the sales-comparison approach would have resulted in an *unreliable* estimate of the fair market value of the subject property. The significance for our case is that *Omni* does not dictate use of the sales-comparison approach where it would result in an *unreliable* estimate of fair market value. The PTAB in the instant case, therefore, followed *Omni* when it found that exclusion of the sales-comparison approach was proper because *reliable* data could not be derived from the sale of the instant landfill or from sales of reasonably comparable properties. This was so because the sales that McCann considered, which resulted from the compulsion created by the Department of Justice divestiture order, did not meet the definition of an arm's-length transaction. At oral argument, the school district and the BOR argued that Onyx's purchase of the instant landfill was an arm's-length transaction, even though the seller was under compulsion to sell, because Onyx was a willing buyer. This is contrary to this court's holding in *Chrysler,* where we said that there has to be both an owner that is ready, willing, and able to sell *but not compelled to do so*, and a buyer that is likewise ready, willing, and able to buy, but is not forced to do so. *Chrysler*, 69 Ill. App. 3d at 211. Nor can we accept the school district's and the BOR's alternative position, articulated at oral argument, that the sale was not part of the divestiture order. The PTAB made a factual finding that it was part of the divestiture order, and the school district and the BOR have not challenged the finding as being against the manifest weight of the evidence.

¶ 49        The PTAB found McCann's appraisal unreliable in other respects as well. Rather than use tipping-fee historical evidence pertinent to the instant landfill, McCann used published data from 2002. The PTAB found that there was nothing in the data McCann used that reflected its accuracy or what the amounts "truly represented." Rather than use available engineering data pertinent to the instant landfill in determining its remaining life, McCann used data published in the IEPA's 2002 annual report, which contained regional data focused primarily on capacity issues and secondarily on fees mandated by law. Accordingly, for all these reasons, we hold that the PTAB did not err in finding that Onyx met its burden of going forward.

¶ 50        The school district and the BOR contend that the PTAB erred as a matter of law in finding that the single-approach appraisals that excluded the sales-comparison approach were the best evidence of fair market value. They rely on three cases. In *Chrysler*, this court reversed the PTAB's decision assessing the Chrysler plant in Belvidere, Illinois, based upon a valuation using the cost approach, because the record showed that the plant could be sold for use as something other than an automobile manufacturing plant. *Chrysler*, 69 Ill. App. 3d at 214. In *United Airlines, Inc. v. Pappas*, 348 Ill. App. 3d 563 (2004), the appellate court

held that United's leasehold interest in space at O'Hare International Airport should be valued using the sales-comparison approach because comparable sales data (other airlines' leases at O'Hare, for instance) was available. *United Airlines*, 348 Ill. App. 3d at 573. Finally, in *Kendall County Board of Review v. Property Tax Appeal Board*, 337 Ill. App. 3d 735 (2003), this court held that property owned by AT&T, zoned agricultural and used for telecommunications, had no actual market and thus it was not error to use a method other than the sales-comparison approach to estimate its fair market value. *Kendall County*, 337 Ill. App. 3d at 741.

¶ 51    None of those cases involved landfills. The PTAB cites five cases from other jurisdictions that did involve valuation of landfills. Most persuasive of the cases the PTAB cites is *Waste Management of Wisconsin, Inc. v. Kenosha County Board of Review*, 516 N.W.2d 695 (Wis. 1994). In *Waste Management*, the subject property consisted of three parcels totaling 388 acres upon which Waste Management operated the Pheasant Run sanitary landfill. *Waste Management*, 516 N.W.2d at 697. In valuing the property, the assessor utilized the income approach exclusively. *Waste Management*, 516 N.W.2d at 698. Waste Management contended that this was improper, and the trial court remanded the matter to the board of review for reconsideration and redetermination. *Waste Management*, 516 N.W.2d at 699. The assessor updated his prior written appraisal and submitted additional analyses utilizing both a market approach and a cost approach. *Waste Management*, 516 N.W.2d at 699. Reconciling the estimates yielded by these various approaches with that originally reached under the income approach, the assessor concluded that the property was worth less than his original estimate. *Waste Management*, 516 N.W.2d at 699. The board of review again affirmed the assessor's estimate, and Waste Management appealed. *Waste Management*, 516 N.W.2d at 700-01. The Wisconsin Supreme Court held that, where the board of review "had reason to doubt the reliability of the market approach," it could reasonably look to other elements, including the income generated by the site, in valuing the property. *Waste Management*, 516 N.W.2d at 702-03. The court concluded that the assessor and the board of review did not err in using the income approach where there was an absence of a recent sale of the property or an absence of recent sales of comparable properties. *Waste Management*, 516 N.W.2d at 702.

¶ 52    Petitioners in our case argue that *Waste Management* actually held that the income approach may never be the sole method utilized. We disagree. In remarking that "[i]ncome may never be the sole basis for the assessment of property" (*Waste Management*, 516 N.W.2d at 702), the Wisconsin Supreme Court was merely saying that the income approach could not be the starting and stopping point. In *Waste Management*, the assessor updated his appraisal after remand, so the record contained both a cost and a market analysis. Obviously, in *Waste Management*, the assessor was able to do a market analysis. In our case, both Kelly and Main explained why the market approach would not be reliable and why they rejected the cost approach. Thus, as in *Waste Management*, Kelly and Main considered other methodologies. We believe that *Waste Management* is persuasive authority for the proposition that, in the absence of reliable market data, the income approach may be utilized.

¶ 53    In our case, none of the comparable sales yielded reliable data, because they were part of the Department of Justice's divestiture order and thus not arm's-length transactions.

Further, while McCann discussed the sales-comparison approach in his appraisal, he did not utilize it in arriving at an estimate of fair market value. Thus, the facts in our case are similar to those in *Waste Management*. Accordingly, the PTAB did not err in assessing the instant landfill based on the single-approach appraisals.

¶ 54 The school district and the BOR next contend that the PTAB's finding that Kelly's cost approach lent support and credence to the income approach was against the manifest weight of the evidence. The school district and the BOR do not challenge the PTAB's decision that, under the income approach, the fair market value of the instant landfill was $10 million. We have already determined that the PTAB did not err in accepting the income approach. Consequently, even if we were to agree that Kelly's cost approach did not lend support and credence to the income approach, it would not support reversal.

¶ 55 For the foregoing reasons, the decision of the PTAB is affirmed.

¶ 56 Affirmed.