# IN THE SUPREME COURT OF TEXAS

════════════
No. 13-0053
════════════

STATE OF TEXAS, PETITIONER,

v.

CLEAR CHANNEL OUTDOOR, INC., RESPONDENT

════════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS
════════════════════════════════════════════════════════

**Argued September 17, 2014**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

The parties dispute the compensation due for condemnation of land with a free-standing billboard used for outdoor advertising, an issue we considered not long ago in *State v. Central Expressway Sign Associates* ("*CESA*").[1] Consistent with that case, we conclude that a billboard may be a fixture to be valued with the land, and that while the advertising business income generated by a billboard should be reflected in the valuation of the land at its highest and best use, the loss of the business is not compensable and cannot be used to determine the value of the billboard structure.

---

[1] 302 S.W.3d 866 (Tex. 2009).

Accordingly, we reverse the judgment of the court of appeals[2] and remand the case to the trial court for further proceedings.

## I

To widen the Katy Freeway near downtown Houston, the State condemned two small, adjacent parcels of property, which the owners had leased to Clear Channel Outdoor, Inc. for outdoor advertising. Clear Channel had built on each parcel a billboard consisting of a 48' x 14' sign face attached to six wooden poles embedded deeply in the ground to withstand hurricane-force winds. The signs were placed in a "V" formation facing opposite directions, so that a sign could be seen from vehicles traveling on both sides of the freeway. The signs were in a highly visible location and were thus in demand by advertisers seeking exposure to the thousands of cars passing on the freeway each day.

The State took the position that its condemnation of the realty did not include the billboards themselves because they were removable personal property for which no compensation was due. Legally, Clear Channel did have the right under its leases with the landowners to remove the billboards. But the billboards could not in fact be removed as usable structures to be placed elsewhere. The billboard components could be removed—the sign faces taken down and the poles cut off at the ground or excavated—but the structures themselves would be destroyed in the process. It is more accurate to say that the billboards could be demolished, and they were. At the State's

---

[2] ___ S.W.3d ___ (Tex. App.—Houston [1st Dist.] 2012).

direction,[3] Clear Channel dismantled the signboards, cut the poles into pieces, and removed the materials from the property. The State paid for the cost.

Further, Clear Channel could not relocate its outdoor advertising business using new billboards without permission from the City of Houston. For many years, the Houston Sign Code has prohibited new construction of "off-premise signs".[4] The Code provides that, in limited circumstances, an owner of a sign displaced by a road-improvement project may obtain a special permit to operate a sign at another location.[5] But Clear Channel believed there was no location comparable to the one it was being forced to leave, especially given the numerous spacing, proximity, and height requirements also imposed by the Houston Sign Code. In addition, a special permit for a relocated sign would extend only for a single, non-renewable ten-year term.[6] Clear Channel's permits for the condemned property, grandfathered under the Code, had no fixed expiration date, and Clear Channel expected that its lease arrangements with the property owners would continue indefinitely. It therefore objected to the time limitation on a special permit, but the

_____

[3] The State argues that it did not "order" the billboards to be removed, asserting that its letter merely "'advised' Clear Channel that the billboards 'would have to be removed from the Property.'" Reply Brief at 3, quoting the State's letter to Clear Channel. Alternatively, the State argues that it lacked authority to issue such a directive before the land was condemned. These arguments do not avoid the fact that Clear Channel removed the billboards at the State's unmistakable and irresistible insistence, and, ultimately, at the State's expense.

[4] Houston Sign Code §§ 4603(a), 4612(b).

[5] Houston Sign Code § 4617(a).

[6] Under the City of Houston's sign code, a sign owner who accepts a special permit to relocate an existing off-premise sign "in lieu of immediate monetarily compensated removal" must agree that the sign owner, at the owner's expense, will remove the sign after ten years. Houston Sign Code § 4617(a)(10).

3

City refused to waive that limit. Consequently, Clear Channel contended that its billboard operation could not be relocated.

Consistent with the State's position, the special commissioners' awards included no compensation for the billboard structures. The landowners and Clear Channel objected to the awards, and Clear Channel counterclaimed for inverse condemnation of the sign structures. The State sought dismissal of the counterclaims, arguing that Clear Channel's right under its leases to remove the structures established that they were not fixtures but personalty.[7] The trial courts denied the State's request and on the State's interlocutory appeals, the courts of appeals affirmed.[8]

The State settled with the landowners and Clear Channel for the compensation due for their fee and leasehold interests, respectively. The parties explained to the trial court that their settlement was based on the value of the interests as used for outdoor advertising. The State argued that the settlements covered all it had taken, taking into account the desirability of the location for outdoor advertising and the permits allowing the site to be used for that purpose. The State asserted that if Clear Channel were entitled to separate compensation for the billboard structures—which the State continued to dispute—the compensation should be limited to the cost to build them. Clear Channel argued that it was entitled to be compensated for the value of the billboards based on the business revenue they generated and that this amount was not included in the settlement. Thus, while the

---

[7] The State, without waiving its right to contest Clear Channel's entitlement to compensation, paid Clear Channel $5,000 each to remove them.

[8] *See State v. Clear Channel Outdoor, Inc.*, 274 S.W.3d 162, 165 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (appeal from denial of plea to jurisdiction in county court at law no. 1); *State v. Clear Channel Outdoor, Inc.*, No. 14-07-00369-CV, 2008 WL 2986392 (Tex. App.—Houston [14th Dist.] July 31, 2008, no pet.) (mem. op.) (appeal from denial of plea to jurisdiction in county court at law no. 3). On remand, the two cases were consolidated for trial.

4

parties disputed whether the loss of the sign structures was compensable, they also disagreed over whether the structures were to be valued as poles and sign faces or as instruments for generating outdoor advertising business. The trial court agreed with Clear Channel.

At trial, the State's expert valued the billboards at $25,000 each, an amount representing replacement cost less depreciation. Clear Channel's expert appraiser, Dr. Rodolfo Aguilar, testified regarding four different methods of valuing the billboard structures for which Clear Channel sought compensation.[9] He testified that he excluded from his appraisal of Clear Channel's property interests any bonus value from the below-market rental rates because this interest had been settled.[10]

Using a cost approach, Aguilar estimated that each billboard was worth approximately $15,000, or $30,000 total. Though his figures were lower than the State's, the approach was the same: value the structures based on their construction cost less depreciation. Aguilar testified, however, that the industry never used this method in buying and selling billboards, and that the preferred method has been the "gross rent multiplier approach", or in some cases, the income approach.

Aguilar's other valuation methods considered the structures as a business. Using an income approach, Aguilar explained that he separated out the "billboard rent" from other inputs, such as the production of vinyl signs to be displayed on the billboard, and subtracted operating costs to run the

---

[9] A regional official for Clear Channel also testified, based on her experience in billboard acquisitions and her personal knowledge of several of the transactions relied upon by Dr. Aguilar, that the value of the billboards in issue would be roughly $700,000.

[10] Bonus value, also referred to as "leasehold advantage", is the difference between the market value of the remaining lease term, taking into account any renewal rights, and the agreed rent. *See Dep't of Trans. v. Drury Displays, Inc.*, 764 N.E.2d 166, 170 (Ill. App. Ct. 2002); *Motiva Enter., LLC v. McCrabb*, 248 S.W.3d 211, 213 & n.1 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (discussing the concept of leasehold advantage).

5

billboard to determine the net operating income of each billboard. He then capitalized the net operating income and arrived at a property value of $692,600.

Aguilar used two different valuation methods under what he called a comparable sales approach. In one, he multiplied Clear Channel's "annual effective net revenue" from the operation of the signs by a "gross rent multiplier" to arrive at a fair market value. The multiplier, he explained, was the ratio of the price paid for the billboard to the revenue and represented the number of years it would take the buyer of the billboard to recover its investment. Using data from sales of similar billboards, Aguilar concluded that an appropriate multiplier would be nine, and arrived at a figure of $767,700. Then, using a weighted average of his income approach and revenue-based comparable sales approach, he determined the value of the billboards to be $722,600.

Aguilar's second comparable sales method simply looked to sales of other billboard operations and compared them based on the square footage of the signs. Aguilar testified that this was like valuing a building based on comparable prices per square foot. He acknowledged, however, that the method is not normally used in the outdoor advertising industry. Aguilar determined the price per square foot of sign face from several comparable sales and adjusted for other factors such as location, the financing terms of the sales, inflation, and the type of materials used to construct each sign. Under this approach, Aguilar valued the billboards at $712,300.

The jury found that the fair market value of the two billboards was $268,235.27. The trial court rendered judgment on the verdict less credits for the amounts that Clear Channel had already received based on the commissioners' award. The court of appeals affirmed.[11]

We granted the State's petition for review.[12]

## II

We begin with the State's contention that by taking the land on which Clear Channel's billboards stood, it did not take the billboards themselves because they were not fixtures but personalty and could have been removed.

The State's argument centers on *Logan v. Mullis*, where we stated:

> Three factors are relevant in determining whether personalty has become a fixture, that is, a permanent part of the realty to which it is affixed: (1) the mode and sufficiency of annexation, either real or constructive; (2) the adaptation of the article to the use or purpose of the realty; and (3) the intention of the party who annexed the chattel to the realty. The third criterion dealing with intention is preeminent, whereas the first and second criteria constitute evidence of intention.

> Intent is made apparent by objective manifestations. As a general rule, intent is a question of fact to be decided by the jury. However, even testimony of intention that the chattel was not meant to become a fixture will not prevail in the face of undisputed evidence to the contrary. Where reasonable minds cannot differ, the issue is one of law rather than one of fact.[13]

The State contends that Clear Channel's intent that the billboards be personalty is manifest in its insistence on the right, under its leases with the landowners, to remove them.

---

[11] ___ S.W.3d ___ (Tex. App.—Houston [1st. Dist.] 2012).

[12] 57 Tex. Sup. Ct. J. 566 (May 16, 2012).

[13] 686 S.W.2d 605, 607–608 (Tex. 1985) (citations omitted).

7

But that right is not determinative of the issue. In *Almota Farmers Elevator & Warehouse Co. v. United States*,[14] the United States Supreme Court considered the compensation due a lessee for improvements to land when the land was condemned. For years, the tenant had operated a grain elevator on the premises, with extensive buildings and improvements.[15] In taking the land, the United States offered to compensate the tenant for his loss of use of the improvements for the remainder of the lease term and for their salvage value when then removed.[16] The tenant insisted on compensation for the greater value of the improvements in place.[17] In concluding that the fair market value of the leasehold could not exclude the likelihood that the lease would be renewed, the Supreme Court observed that a tenant's right to remove improvements when the lease ends cannot be invoked by the condemnor to limit compensation for a taking.[18]

The State argues that *Almota* is irrelevant because the improvements there were unquestionably fixtures and the issue was how to value them, whereas the issue in the present case is whether the billboards were fixtures at all. But the Supreme Court's observation that the nature of improvements to land is not conclusively determined by a tenant's right to remove them is sensible and guides the proper application of the *Logan* test. The billboards in this case could not have been removed for use elsewhere any more than the elevator and other buildings in *Almota*.

---

[14] 409 U.S. 470 (1973).

[15] *Id.* at 470–471.

[16] *Id.* at 471–472.

[17] *Id.* at 472.

[18] *Id.* at 477 n.5 (citing 4 P. Nichols, EMINENT DOMAIN § 13.121(2) (3d rev. ed. 1971)).

When an improvement to land, whether a building or a sign, cannot be removed except in useless pieces, it is almost certainly a fixture under *Logan*'s first factor, even if the tenant has a legal right to the pieces.

Moreover, *Logan* establishes that an improvement can be a fixture even if removal is physically possible. In that case, we concluded that a railroad tank car imbedded in a creek as a culvert under a roadway was a fixture, even though it could be, and actually had been, removed.[19] The tank car had been designed to be a permanent part of the road.[20] Likewise, in *Brazos River Conservation & Reclamation District v. Adkisson*,[21] we held that an oil and gas lessee's well casing and other well-site equipment in an area condemned for a water reservoir were fixtures for which compensation was due, even though the lessee had the right to remove these trade fixtures and could have done so before inundation. We noted that if the lessor had drilled the wells himself, the casing and other equipment would have become part of the land.[22] As such, the condemning authority was required to pay for the equipment. "Where fixtures are of such a character that if put in by the owner, they would constitute a part of the real estate," we explained, "*they must be paid for as real estate by the party condemning the land.*"[23]

---

[19] *Logan*, 686 S.W.2d at 608.

[20] *Id.*

[21] 173 S.W.2d 294 (Tex. Civ. App.—Eastland 1943, writ ref'd).

[22] *Id.* at 298.

[23] *Id.* at 299 (emphasis in original) (internal quotations omitted) (quoting 10 RULING CASE LAW § 125 (William M. McKinney & Burdett A. Rich, eds., 1916)); *see also Tex. Pig Stands, Inc. v. Krueger*, 441 S.W.2d 940, 945 (Tex. Civ. App.—San Antonio 1969, writ ref'd n.r.e.) ("If the improvements were affixed to the premises in such manner as to constitute part of the realty, the condemner would have to compensate lessee for such improvements, notwithstanding

The relevant intent under *Logan* is objective rather than subjective. It is "made apparent by objective manifestations", and assertions cannot prevail over facts.[24] When considered in light of *Adkisson*, *Logan* indicates that whether property has become a fixture depends on whether a hypothetical owner of an undivided fee would have intended the personalty to become a permanent part of his real property, taking into account the "mode and sufficiency of the annexation, either real or constructive" and "the adaptation of the article to the use or purpose of the realty".[25] Under such test, lease terms allowing a tenant to remove the property are irrelevant. If the property affixed by this hypothetical undivided fee-holder would be a fixture, it is part of the real estate for condemnation purposes and is to be included in the compensation awarded.[26] The compensation is then to be divided amongst the various interest-holders.[27]

The court of appeals was too quick to conclude that *Logan* "conflicts with well-settled principles concerning whether a property owner has the right to compensation in the condemnation

the fact that as between the lessor and lessee the improvements were regarded a personalty.").

[24] *Logan v. Mullis*, 686 S.W.2d 605, 607–608 (Tex. 1985).

[25] *Id*. at 607.

[26] *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 873 (Tex. 2009) ("The undivided-fee rule states that when real property has been carved into different interests, the property is valued for condemnation purposes as if it were owned by a single party. The purpose of the rule is to award full compensation for the land itself, and not for the sum of the different parts." (citations omitted)).

[27] *Id*. ("[W]hile each interest-holder is entitled to a share of the compensation award, the award should be paid for the property itself, then apportioned between them. When the property is subject to a lease, the fact-finder first determines the market value of the entire property as though it belonged to one person, then apportions that value between the lessee and the owner of the fee." (citations omitted)); *Urban Renewal Agency v. Trammel*, 407 S.W.2d 773, 774 (Tex. 1966) ("In condemnation proceedings where the property sought is subject to a lease, the judge or jury first determines the market value of the entire property as though it belonged to one person. Then the fact finder apportions the market value as between the lessee and the owner of the fee."); *see also Tex. Pig. Stands*, 441 S.W.2d at 944–945.

context"[28] and thus "does not apply to condemnation claims."[29] Under *Logan*, whether an improvement to land is a fixture is to be determined by the realities of the situation; the considerations prescribed are generally applicable in all cases, including condemnation cases.

The State argues that it could not have taken the billboard structures because it never took physical possession of them. But the State required the billboards to be destroyed. The Texas Constitution explicitly guarantees compensation if private property is "taken, damaged, or destroyed for or applied to public use without adequate compensation".[30] The principle holds true under the federal Constitution as well.[31] The State also argues that Clear Channel should not be entitled to compensation for the billboards when it had the opportunity to relocate its billboard operations under Houston's relocation program. But even if Clear Channel had relocated its operations, in the City of Houston or elsewhere, that relocation would not in itself preclude Clear Channel from recovering compensation for the structures themselves, which were clearly taken.

---

[28] *State v. Clear Channel Outdoor, Inc.*, 274 S.W.3d 162, 165 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (appeal from denial of plea to jurisdiction in county court at law no. 1).

[29] ___ S.W.3d ___ , ___. (Tex. App.—Houston [1st Dist.] 2012).

[30] TEX. CONST. art. I, § 17; *see also DuPuy v. City of Waco*, 396 S.W.2d 103, 106–108 (Tex. 1965).

[31] *See Stop the Beach Renourishment, Inc. v. Fla. Dep't. of Envtl. Prot.*, 560 U.S. 702, 713 (2010) (explaining that state actions that have the same effect as "a transfer of property to the State . . . by eminent domain" are takings); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1016–1019 (1992) (recognizing that regulation that destroys all value of the property is a taking); *United States v. Lynah*, 188 U.S. 445, 468–469, 474 (1903) (holding that flooding that rendered a rice plantation an "irreclaimable bog, unfit for the purpose of rice culture or any other known agriculture" was a taking), *overruled in part by United States v. Chi., Milwaukee, St. Paul & Pac. R.R.*, 312 U.S. 592, 597–598 (1941) (holding that injuring or destroying property below a navigable river's high-water mark would not be a taking but an exercise of Congress's power over navigable waters).

As we have explained, Clear Channel's billboards were fixtures if a unified fee-holder would have intended them to become a permanent part of the land.[32] This is evidenced by "the mode and sufficiency of annexation" and the "adaptation of the article to the use or purpose of the realty."[33] The billboards were firmly embedded in the earth; their removal required that the poles be cut and the signs dismantled. Moreover, the billboards were perfectly suited to the use of the realty, which was outdoor advertising alongside a busy freeway. On this record, the hypothetical holder of a unified fee would have intended the billboard structures to become a part of the real estate as a matter of law. Compensation for their loss should therefore have been included in the compensation for the land. This is not to say that all sign structures are necessarily fixtures. Different construction methods may make a billboard structure more portable than those in this case. Were a sign less firmly embedded in the ground, more easily moveable, or located on land not actually useful for advertising, it might well remain personalty. Courts are to determine whether any particular billboard is a fixture in a condemnation case based on the *Logan* test as framed from the perspective of a holder of the unified fee.

### III

While Clear Channel's billboard structures were fixtures and should have been valued as part of the land, the State insisted that their value be excluded from the parties' agreement settling the compensation due for the fee and leasehold interests taken. Clear Channel is therefore due compensation for the sign structures. The State contends that the amount due is limited to the cost of

---

[32] *Adkisson*, 173 S.W.2d at 298.

[33] *Logan*, 686 S.W.2d at 607–608.

the structures themselves. Clear Channel argues that the value of the billboards should be based on the profits generated by their use in advertising.

This dispute is resolved by our decision in *CESA*.[34] There, too, the State condemned property for highway improvement.[35] CESA owned an easement on the property for use as a billboard site and leased the site to Viacom, the billboard operator.[36] The State settled with the owner of the fee and agreed to pay for Viacom's removal of its business to a new location.[37] The remaining dispute was over the compensation due for the easement and leasehold.[38] The trial court excluded the State's expert's valuation of those interests because it failed to take into account the revenue earned by Viacom's advertising business.[39] The only other evidence was that of CESA's principals.[40]

We held that the State's evidence should have been admitted, rejecting CESA and Viacom's argument that "billboard advertising revenue is derived from the intrinsic value of the land, and therefore that revenue should be treated like rental income for purposes of an income-method appraisal."[41] "Texas law", we said, generally provides that "income from a business operated on the

---

[34] *State v. Cent. Expressway Sign Assocs.,* 302 S.W.3d 866 (Tex. 2009).

[35] *Id.* at 869.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *CESA*, 302 S.W.3d at 870.

[40] *Id.*

[41] *Id.* at 871.

13

property is not recoverable and should not be included in a condemnation award", "even when there is evidence that the business's location is crucial to its success."[42] We explained:

> Courts have applied this rule for two reasons: first, because profits from a business are speculative and often depend more upon the capital invested, general market conditions, and the business skill of the person conducting it than [they do] on the business's location; and second, because only the real estate and not the business has been taken and the owner can presumably continue to operate the business at another location.[43]

We noted that the opinions of the State's expert excluded by the trial court "did not overlook the value of the property as a billboard location" and should not have been excluded.[44] The rent paid by Viacom to use the property, "which formed the basis of [the expert's] income-method appraisal, also accounted for the value of the location [because] a property better suited to billboard advertising would presumably be able to command a higher rent."[45] We concluded that "evidence of valuation based on advertising income" is inadmissible, while "[g]eneral estimates of what the property would sell for considering its possible use as a billboard site are acceptable."[46]

Clear Channel argues that *CESA* is inapposite because, unlike the present case, it involved only the valuation of the billboard site—the land—and not the billboard structure. As we have explained, the billboards were fixtures and should have been valued with the land, but now—because the State insisted the billboards were not taken and refused to pay compensation for them—the

---

[42] *Id.*

[43] *Id.*

[44] *CESA*, 302 S.W.3d at 874.

[45] *Id.*

[46] *Id.*

14

billboards must be valued separately. But this separate valuation can add nothing different to the overall compensation due. The undivided-fee rule, as we explained in *CESA*, requires that "when real property has been carved into different interests, the property is valued for condemnation purposes as if it were owned by a single party."[47] In both cases, the billboards were removed, the State paid for the fee and other real interests, and the claimants sought compensation for the loss of the advertising business. Whether the various interests are valued together or separately, the undivided-fee rule requires that the outcome be the same. Absent exceptions not applicable here, "income from a business operated on the property is not recoverable and should not be included in a condemnation award."[48] Valuing the billboards separately from the land cannot afford Clear Channel compensation for lost business income that could not be recovered in *CESA*.

Clear Channel argues that capitalizing income from the use of property, as its expert did, is an accepted way of valuing income-producing property. While that is true, the property its expert valued—the billboard advertising operations—was not the property taken.[49] Clear Channel would equate those operations to the billboard structures. But the State did not take Clear Channel's business; it took only the land and the billboard structures—poles and signboards. Clear Channel remains completely free to continue to operate its business wherever it chooses, subject to any

---

[47] *Id.* at 873.

[48] *Id.* at 874.

[49] Likewise, the comparable sales relied upon by Dr. Aguilar and by Clear Channel's regional representative were sales of more than what was taken here. The record makes clear that these sales involved the transfer of assets for which a condemnee is not entitled to compensation, including advertising contracts. Clear Channel argues that its representative's testimony is sufficient to sustain the verdict, but this is not so because this testimony was based on the same assets sales considered by Dr. Aguilar.

restrictions imposed at the new site. The income method can be used to value the land, but the relevant income is that received by the unified fee-holder for the use of the land, the property being condemned, not the business income generated by the billboards, the operator's profits. The business income may be some indication of the rental value of the land for use as a billboard site, though other market factors are likely to be equally important, such as the availability of similar sites. Here, the owners of land on a busy freeway could be expected to receive more in rent from Clear Channel than they could if their property instead bordered a country road with no traffic, and how much more might be reflected in the profits to be made at the better location. But the rent Clear Channel paid to the landowners was not based on Clear Channel's business profits. Even when the profitability of an operation on the property gives some indication of what the operator will pay in rent, the value of the land cannot be determined from the business income. Again, as we explained in *CESA*, "profits from a business are speculative and often depend more upon the capital invested, general market conditions, and the business skill of the person conducting it than [they do] on the business's location".[50]

Clear Channel argues that its situation is also different from *CESA* because the billboard operator there could relocate its business, while Clear Channel could not. But the undisputed evidence is that Clear Channel *could* have relocated its business, albeit on terms and at a location that would not have been as favorable as those it enjoyed on the Katy Freeway. Again, as we stated in *CESA*, "Texas courts have refused to consider business income in making condemnation awards even when

---

[50] *Id.* at 871.

16

there is evidence that the business's location is crucial to its success."[51] In its settlement with the State, Clear Channel was fully compensated for the value of its leasehold, presumably taking into account the desirability of the site for outdoor advertising and all other factors affecting the value of the interests in the land, and Clear Channel is not entitled to further compensation for its loss of business operations at the site.[52]

The compensation the State owed for the land taken, given that its highest and best use was for outdoor advertising, should have taken into account the facts that the necessary permits were in place and that the site was especially suited to that use. Valuation should have taken into account the rents the owner could command from so desirable a location. We can only presume the parties considered all these factors in arriving at an agreement on the compensation due. Even if they did not, their settlement forecloses all these issues. It remained to the owners of the fee and leasehold to divide that compensation, which they did. Only the billboard structures themselves were excluded from the settlement, and the compensation due for them can be based only on their cost—$25,000 per sign in the State's view, $15,000 per sign in Clear Channel's. Clear Channel is not entitled to value the structures based on the income from its advertising operations, and evidence of that income was inadmissible. Its admission clearly resulted in an erroneous verdict.

---

[51] *Id.*

[52] We are not concerned here with a business that could not possibly be conducted at all at another site.

17

*     *     *     *     *

The judgment of the court of appeals is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

_____
Nathan L. Hecht
Chief Justice

Opinion delivered: April 24, 2015