

# NUMBER 13-22-00070-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

THE STATE OF TEXAS,                                                 Appellant,

v.

RONALD GILES, ET UX., ET AL.,                                      Appellees.

## On appeal from the 329th District Court
## of Wharton County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Silva**
**Memorandum Opinion by Justice Longoria**

The State of Texas challenges the trial court's final judgment in a condemnation proceeding to acquire title to real property owned by appellees KEM Texas, Ltd. (KEM), Ronald Giles, and Tamara Giles. The State argues: (1) a billboard owner in a condemnation proceeding is not permitted "to value its leasehold interest separately from the land based on billboard advertising revenue"; (2) the trial court improperly admitted

evidence offered by KEM; and (3) there was "no evidence or insufficient evidence to support the jury's verdict." We affirm.

## I. BACKGROUND

The Gileses own 2.09 acres of land along U.S. Highway 59 in Wharton County. In May 2010, Vista Media entered into a thirty-year lease agreement with the Gileses for a portion of the property which allowed for the construction and operation of a billboard on the property. Subsequently, KEM acquired the lease and erected Board 1710. The State notified KEM that it was widening and improving U.S. Highway 59, which would require the removal of Board 1710. The State and KEM came to an agreement on the valuation of the billboard structure and the State acquired the structure by quitclaim deed for $94,050. The board was removed, and a relocation permit was approved. However, because the State and KEM were unable to agree on a valuation of the real estate and interest therein to be condemned, the State filed a statutory condemnation lawsuit in December 2018, seeking to acquire title to a 0.3831-acre section of the Gileses' property (Parcel 42), which included the land on which Board 1710 was located. *See* TEX. PROP. CODE ANN. § 21.012 (authorizing an entity with eminent domain authority to initiate condemnation suit if unable to agree with property owner as to damages).

On February 26, 2019, a special commissioners' hearing was held regarding the State's condemnation suit. *See id.* § 21.014(a) (providing for trial court to appoint special commissioners to assess amount of damages that property owner will suffer from condemnation); *id.* at § 21.015(a) (providing for prompt hearing before special commissioners). The Gileses did not appear. The special commissioners awarded KEM

2

$152,258.85 for the taking of KEM's leasehold interest and awarded the Gileses $19,950 for the land taking. The State objected to the decision, prompting a trial de novo in the district court. *See id.* § 21.018 (providing that party may object to findings made by special commissioners and requiring trial court to then try case like any other civil suit); *see also PR Invs. & Specialty Retailers v. State*, 251 S.W.3d 472, 476 (Tex. 2008) (hearings before special commissioners are generally not recorded and a condemnation suit is tried de novo by trial court when party objects to commissioners' findings).

Prior to trial, the State designated Michael Welch and Ben Cervenka as expert witnesses and KEM designated Ben Metoyer and Wayne Baer as expert witnesses. Subsequently, the State designated Welch as its sole appraiser for trial. The State moved to exclude KEM's expert witnesses, arguing that the valuation theory used by those experts "(1) improperly relied on KEM's billboard advertising revenue (inadmissible business income); (2) violated the unified fee rule; (3) violated the before-and-after rule; and (4) intentionally distorted the fair market value of Parcel 42." After a hearing on the motion, the trial court denied it. After some discovery was conducted, including depositions of KEM's expert witnesses, the State again moved to exclude their testimony. That motion was also denied by the trial court.

At trial, Cervenka was called to testify by the Gileses. Cervenka explained that he was hired by the State to "form an opinion of fee simple market value of just compensation for the acquisition that the State was taking from the landowner." In particular, he stated that market value is "a price paid for property that's bought or sold, willing buyer and willing seller" and that this property's "highest and best use" was as commercial property.

3

Cervenka testified that just compensation for the Gileses' interest in Parcel 42 was $61,207, which he based on his analysis of property values from surrounding areas as well as improvements to the land.

He further explained that he was tasked with determining a value of the property as a whole, including the leasehold interest possessed by KEM. Cervenka explained that the total value of the property as a whole was $135,455. KEM's lease is a 4,000-square-foot portion of Parcel 42 which Cervenka valued at $47,500 in annual rent. Cervenka stated that he arrived at the $47,500 figure by taking market rental value for the property and subtracting "management" expenses. To reach that opinion, Cervenka "gathered rentals of properties that were rented for sign sites" and determined that the rental value was $3,000 per year. The capitalization rate he used was six percent, which he based off of a "Price Waterhouse Coopers survey."

Metoyer testified that, in his role as vice president of KEM, his job "is to identify locations that meet the regulations, negotiate an agreement with that property owner to have a sign, and then apply for and obtain all the billboard permits required," and he oversees the process from start to finish. As to the particular location at issue, Metoyer explained that there are regulations that limit the locations available for signs, and the subject property is one of very few along that stretch of highway that meet the criteria for a billboard. He described the location as one that had "good traffic" and "demand for advertisers," stating that approximately 25,000 cars travel by the sign each day.

Metoyer explained that the State's highway project would include building a ramp from "one end of the property to the other" which would eliminate the possibility for any

4

new sign to be placed on the property because signs cannot be placed "within so many feet of a ramped intersection." Metoyer testified that the State's project rendered the billboard lease KEM has with the Gileses "worthless." At the time of the removal of the billboard, KEM was paying $2,760 per year on the lease. Metoyer stated that he did not believe it would be possible to obtain a lease elsewhere for the same amount because that amount was below market value. Metoyer testified that, when he is calculating a fair offer to a property owner, he bases the offer on his knowledge of the market, and typically, at the time of the taking in 2019, that offer would be "30 percent of the projected [annual] advertising revenue," as that is industry standard. At the time the billboard was taken down, KEM had advertising contracts for the subject billboard that generated $3,600 every four weeks, or $46,800 per year. According to Metoyer's testimony, while KEM was only paying $2,760 per year on its lease with the Gileses, it would instead expect to pay over $14,000—i.e., thirty percent of the advertising revenue—on a new lease for the same sign in another location.

The State extensively cross-examined Metoyer regarding the different contracts in place for the billboard over the years 2015 through the taking in 2019. Ultimately, Metoyer agreed that "the annual advertising revenue . . . was never [$]46,800" in any of the five years leading up to the taking by the State. He explained that, as of the day they removed the billboard, the contract in place would have generated a market rent of over $40,000 annually. Prior to that point, the highest revenue received on the subject billboard was $17,088 for the year 2016.

Baer, KEM's commercial real estate appraisal expert, testified similarly to Metoyer that the lease KEM had with the Gileses was below market value. Baer was tasked with determining the value of KEM's leasehold interest as of the date of the taking, April 3, 2019. Baer made a "final estimate" of $179,000 for the value of the leasehold interest belonging to KEM. To reach his opinion, Baer used an income capitalization approach, which required him to determine the annual advertising revenue, the fair market ground rent, the actual ground rent paid, and expenses. With the information obtained he arrived at a market valuation of $182,367. Baer also followed another approach he referred to as "a discounted cash flow analysis," which resulted in a valuation of $175,003. He then reconciled the two valuations to reach an opinion of $179,000 for KEM's leasehold interest.

Welch testified as the appraiser for the State. Welch explained that he was tasked with determining the value of the property to be acquired by the State, which included the land itself, owned by the Gileses, as well as the portion of the land being used for a sign site. He first appraised the land to determine its "highest and best use" which, like Cervenka, he determined to be commercial development. He then valued the land at $1.00 per square foot. As to the valuation of the sign site, Welch explained that his process includes reviewing the lease for the sign site and looking at comparable leases as well. He testified that the lease was not below market rates at the time of the taking, explaining that "we know that the subject property leases for [$]2,760 a year. We have a comparable two miles away at [$]3,000, another at [$]1,800, and another at [$]2,650. These are excellent comparables for what someone would pay for a sign site." He

ultimately determined a value of $3,000 per year for market rent value of the property. Applying a nine-percent capitalization rate and deducting for administrative costs, Welch determined that the sign site value was $32,667. He reached a value of $48,387 for the entire subject property of just over two acres. He explained that the total amount should go to the Gileses because he did not believe "that KEM has a positive leasehold position." On cross-examination, he agreed that Cervenka applied a six percent capitalization rate, which would account for a the large portion of the difference between Cervenka's $61,207 valuation and his $48,387 valuation.

The jury awarded a total of $159,033, apportioning $85,667 to the Gileses and $73,366 to KEM. The State filed a motion for new trial challenging the factual and legal sufficiency of the evidence, which was denied. This appeal followed.

## II.    KEM's EXPERT TESTIMONY

By its first and second issues, the State challenges the admissibility of the testimony of KEM's experts regarding valuation. The State argues that the valuation theory used by KEM's experts was "misleading, irrelevant, unreliable, and violative of Texas condemnation law."

The expert testimony of appraisal witnesses in condemnation actions must be relevant and reliable under Texas Rule of Evidence 702. *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998); *see* TEX. R. EVID. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge

will help the trier of fact to understand the evidence or to determine a fact in issue."). Appraisal expertise is a form of specialized knowledge used to assist the trier of fact to determine a fact in issue. *Guadalupe-Blanco River Auth.*, 77 S.W.3d at 807. We review the trial court's decision to admit the expert appraisal testimony under the abuse of discretion standard. *Id.* A trial court does not abuse its discretion by admitting expert testimony if the testimony is relevant to the issues in the case and is based on a reliable foundation. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009); *State v. Moore Outdoor Props., L.P.*, 416 S.W.3d 237, 247 (Tex. App.—El Paso 2013, pet. denied).

## A.  Billboard Revenue

The State's first argument is that KEM's experts used the advertising revenue from the billboard to determine the leasehold value, in violation of the holdings in *State v. Clear Channel Outdoor, Inc.*, 463 S.W.3d 488 (Tex. 2015), and *Central Expressway*. KEM responds that the advertising revenue was not used to determine the leasehold value, but rather to determine the market value for the ground rent which was then used in the accepted methodology to determine the leasehold value of the subject property.

Texas recognizes three approaches to determining the market value of condemned property: the comparable sales method, the cost method, and the income method. *Cent. Expressway*, 302 S.W.3d at 871 (citing *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001)). In a condemnation proceeding, the burden to establish the value of the condemned property is on the condemnee. *Religious of Sacred Heart of Tex. v. City of Houston*, 836 S.W.2d 606, 613 (Tex. 1992).

8

Texas law allows income from a business operated on the property to be considered in a condemnation proceeding in two situations: (1) when the taking, damaging, or destruction of property causes a material and substantial interference with access to one's property, and (2) when only a part of the land has been taken, so that lost profits may demonstrate the effect on the market value of the remaining land and improvements. *Cent. Expressway*, 302 S.W.3d at 871. With the exception of these two situations, "income from a business operated on the property is not recoverable and should not be included in a condemnation award," because profits from a business are speculative, and because the business itself has not been taken and can presumably continue to operate at another location. *Id.*

In *Central Expressway*, the Texas Supreme Court made it clear that revenues from billboard advertising cannot be used as the basis for determining the fair market value of property taken in a condemnation proceeding. *Id.* at 871–74 (noting that Texas courts "have refused to consider business income in making condemnation awards even when there is evidence that the business's location is crucial to its success" and finding "nothing to indicate that a billboard's location is any more significant to their business than it would be to a retail establishment whose profitability depends upon visibility and easy access"). However, that is not what KEM's experts did. Here, KEM's experts took into account the rents the owner could command in such a desirable location to determine the value of the property. The discussion around advertising revenue was to determine an appropriate rental amount for the property, not as the basis of the fair market value for the property taken. Accordingly, admission of the testimony did not violate the holdings of *Clear*

9

*Channel* and *Central Expressway*.

We note that, while "the loss of the business is not compensable and cannot be used to determine the value of the billboard structure," "the advertising business income generated by a billboard should be reflected in the valuation of the land at its highest and best use." *Clear Channel*, 463 S.W.3d at 490.

> The income method can be used to value the land, but the relevant income is that received by the unified fee-holder for the use of the land, the property being condemned, not the business income generated by the billboards, the operator's profits. The business income may be some indication of the rental value of the land for use as a billboard site, though other market factors are likely to be equally important, such as the availability of similar sites.

*Id.* at 497–98.

## B.     Undivided-Fee Rule

The State also argues that KEM's expert testimony was unrealiable because it violated the unified or undivided-fee rule. Where condemned property is subject to multiple interests—for example, those of an owner, a lessee, and a sublessee—the "undivided-fee rule" provides that "the property is valued for condemnation purposes as if it were owned by a single party." *See Cent. Expressway*, 302 S.W.3d at 873 (first citing *State v. Ware*, 86 S.W.3d 817, 822 (Tex. App.—Austin 2002, no pet.); and then citing *Aronoff v. City of Dallas*, 316 S.W.2d 302, 307–08 (Tex. App.—Texarkana 1958, writ ref'd n.r.e.)). "The purpose of the rule is to award full compensation for the land itself, and not for the sum of the different parts." *Id.* (citing *Ware*, 86 S.W.3d at 824). "While each interest holder is entitled to a share of the compensation award, the award should be paid for the property itself, then apportioned between them." *Id.* (citing *Aronoff*, 316 S.W.2d at 307–

10

08) (cleaned up). "When the property is subject to a lease, the fact-finder first determines the market value of the entire property as though it belonged to one person, then apportions that value between the lessee and the owner of the fee." *Id.* (first citing *Urban Renewal Agency v. Trammel*, 407 S.W.2d 773, 774 (Tex. 1966); and then citing *Aronoff*, 316 S.W.2d at 302).

It is well-settled that a lessee is entitled, as a matter of law, to share in a condemnation award when part of its leasehold interest is lost by condemnation. *Motiva Enters., LLC v. McCrabb*, 248 S.W.3d 211, 214 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *see also Texaco Ref. & Mktg., Inc. v. Crown Plaza Grp.*, 845 S.W.2d 340, 342 (Tex. App.—Houston [1st Dist.] 1992, no writ). Both the fee owner and lessee are entitled to share in the award according to their respective interests. *Texaco Ref. & Mktg., Inc.*, 845 S.W.2d at 342. Unless a lease provides that it terminates upon condemnation, the tenant will recover compensation for the unexpired term. *Motiva Enters., L.L.C.*, 248 S.W.3d at 214. A lessee has the burden to establish prima facie proof of its ownership interest in the subject property and the value of that interest. *Soc'y of Mary's Stars, Inc. v. State*, 748 S.W.2d 320, 323 (Tex. App.—Fort Worth 1988, writ denied). A lessee is "entitled to receive compensation for the difference, if any, between the market rental and the contract rental for the balance" of the term. *Tex. Pig Stands, Inc. v. Krueger*, 441 S.W.2d 940, 945 (Tex. App.—San Antonio 1969, writ ref'd n.r.e.).

The State argues that Baer's expert testimony violated the undivided-fee rule because it only related to the leasehold interest value. We disagree. As the lessee, KEM bore the burden to establish proof of its ownership interest in the subject property *and the*

11

*value of that interest*. *See Soc'y of Mary's Stars*, 748 S.W.2d at 323. Baer was not tasked with valuing the Gileses property as a whole and did not suggest that it recover the value of the leasehold separately from the value of the land. The jury was tasked with determining the value of the land as a whole and then to apportion that value between the Gileses and KEM. We cannot conclude that the testimony was unreliable for violating the undivided-fee rule.

## C. Before-and-After Rule

The State additionally contends that KEM's expert testimony violated the "before-and-after rule." The general rule for determining fair market value is the before-and-after rule, which requires measuring the difference in the value of the land immediately before and immediately after the taking. *Callejo v. Brazos Elec. Power Coop., Inc.*, 755 S.W.2d 73, 76 (Tex. 1988); *City of Pearland v. Alexander*, 483 S.W.2d 244, 247 (Tex. 1972). When, as here, only part of the land is taken for an easement, a partial taking occurs. *Westgate, Ltd. v. State*, 843 S.W.2d 448, 456 (Tex. 1992). In this situation, the before-and-after rule still applies, but compensation is measured by the market value of the part taken plus any diminution in value to the remainder of the land. *Id.*; *State v. Meyer*, 403 S.W.2d 366, 371 (Tex. 1966); *City of Austin v. Cannizzo*, 267 S.W.2d 808, 812 (Tex. 1954).

Much of the State's argument in this sub-issue relates to KEM's use of billboard revenue to determine property value. Having already determined that KEM's use of billboard revenue to determine market value for ground rent was not improper, we decline to readdress that issue here. In any event, KEM's experts testified as to the value of its

12

leasehold interest when the lease was entered into, the value at the time of the taking, and the projected value after. As such, the testimony did not violate the before-and-after rule.

**D.     Comparable Leases**

The State next argues that KEM's "use of comparable leases does not meet the test of similarity set forth by the Texas Supreme Court."

> Courts have long favored the comparable sales approach when determining the market value of real property. *See, e.g., Bauer v. Lavaca-Navidad River Auth.*, 704 S.W.2d 107, 110 (Tex. App.—Corpus Christi[–Edinburg] 1985, writ ref'd n.r.e); *County of Bexar v. Cooper*, 351 S.W.2d 956, 958 (Tex.[] App.—San Antonio 1961, no writ); *accord United States v. 8.41 Acres of Land*, 680 F.2d 388, 395 (5th Cir. 1982). If the goal of an appraisal is to ascertain market value, then logically there can be no better guide than the prices that willing buyers and sellers actually negotiate in the relevant market. Under a comparable sales analysis, the appraiser finds data for sales of similar property, then makes upward or downward adjustments to these sales prices based on differences in the subject property.

*City of Harlingen*, 48 S.W.3d at 182. The State asserts that Baer "chose to ignore all of KEM's leases in the market area" and instead used billboard leases located in areas with nearly thirteen times the amount of traffic flow, and all of which contained percentage-of-revenue terms that were absent in the subject lease. While KEM argues that Baer's presentation of the comparable leases was used to determine the percentage of revenue the leases paid in ground market rent, it also notes that "an expert's opinion is not inadmissible for lacking market data; the lack of market data merely goes to the weight of the testimony and is a factor for the jury to consider in evaluating the credibility of the expert's testimony." *Dallas County v. Crestview Corners Car Wash*, 370 S.W.3d 35, 41, n.12 (Tex. App.—Dallas 2012, pet. denied). Baer did not use the supposedly comparable

leases to determine the value of the property; rather, he used the leases, as well as industry knowledge and review of industry materials, to determine that ground rent for the lease would be approximately thirty percent of advertising revenue. He then used that determination to make his opinion of the value of the leasehold in the subject property. As such, we agree with KEM that Baer's opinion was not inadmissible on this ground, but rather the jury could consider what weight to give to the testimony based on the information he presented. *See id.*

E.       **Misrepresentations of Material Facts**

In its last point in these issues, the State complains that Metoyer and Baer misrepresented material facts to mislead and confuse the jury. The State contends that the advertising revenue of $46,800 annually had no basis in fact and was controverted by KEM's own evidence.

As noted, to be admissible, expert opinions need to be both relevant and reliable. *Cent, Expressway*, 302 S.W.3d at 870. The State argues that the misleading calculations were unreliable because they were based on false figures of revenue. The State, on cross-examination of Metoyer, elicited testimony that prior to the taking, the billboard did not generate over $40,000 in annual income. However, Metoyer also testified that, on the actual date of the removal of the sign, there were two contracts in place for the sign, one for each side, each of which generated $3,600 per four-week period, which would have amounted to $46,800 for the year.

While the State is correct that the projected annual advertising revenue of over $40,000 had never been generated in any single year prior to the taking, the expert

14

testimony that such revenue will be generated under existing contracts was not false information. Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). They may choose to believe one witness and disbelieve another. *Id.* Reviewing courts cannot impose their own opinions to the contrary. *Id.* As such, we do not find that KEM's expert testimony was a misrepresentation of material facts.

We overrule the State's first and second issues.

### III.  SUFFICIENCY OF THE EVIDENCE

By its third issue, the State contends that there was "no evidence or insufficient evidence" to support the jury's verdict. We construe this as a challenge to the legal sufficiency of the evidence. When the appellant challenges the legal sufficiency of the evidence supporting an adverse finding on which she did not have the burden of proof at trial, she must demonstrate that there is no evidence to support the adverse finding. *See City of Keller*, 168 S.W.3d at 827; *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). Under a legal sufficiency review, we consider all of the evidence in the light most favorable to the prevailing party, make every reasonable inference in that party's favor, and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller*, 168 S.W.3d at 807, 822, 827. We cannot substitute our judgment for that of the factfinder if the evidence falls within this zone of reasonable disagreement. *Id.* at 822.

The evidence is legally insufficient to support a finding only if (1) the record discloses a complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the only

15

evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810. "Anything more than a scintilla of evidence is legally sufficient to support the finding." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "More than a scintilla [of evidence] exists when the evidence would enable reasonable and fair-minded people to reach different conclusions." *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014). "However, if the evidence is so weak that it only creates a mere surmise or suspicion of its existence, it is regarded as no evidence." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex. 2014).

In addition to repeating its attack on the admissibility of the valuation evidence, the State argues that the jury's verdict in the amount of $159,033 is not supported by any of the evidence. Courts have recognized that a jury "is not tied to awarding damages exactly as requested by the injured party." *PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 519 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (first citing *Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 606 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); and then citing *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 73 (Tex. 2000)). Here, the jury heard evidence from experts that the property as a whole could be worth anywhere from $48,387 to $182,367. The jury awarded an amount less than KEM sought, but more than the State valued the property at. Because we have determined the evidence presented by the experts was properly before the jury, we conclude that the jury's award was supported by legally sufficient evidence. *See City of Keller*, 168 S.W.3d at 827.

The State's third issue is overruled.

16

## IV.    Conclusion

The judgment of the trial court is affirmed.

NORA L. LONGORIA
Justice

Delivered and filed on the
16th day of November, 2023.